# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| SOUTHLAND GAMING OF THE VIRGIN ISLANDS, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Civil No. 2018-107 ) |
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS AND GOVERNOR KENNETH E. MAPP, IN HIS OFFICIAL CAPACITY, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM OPINION

On March 22, 2019, the undersigned granted VIGL Operations, LLC's motion to intervene. [ECF 31]. On May 14, 2019, the District Court entered an Order finding that "a seminal issue that must be determined in this case is: what understanding of the definitional and functional breadth of the [Video Lottery Terminal] machines did the parties reasonably have at the time [Southland Gaming of the Virgin Islands, Inc. and the Virgin Islands Lottery] entered into the VLT contract." Order [ECF 57] at 6. Noting that VIGL "is not a party to the Video Lottery contract," and reviewing several cases from the United States Court of Appeals for the Third Circuit, the District Court ordered the undersigned to "review whether intervention by VIGL would be more appropriate if granted at the remedial stage of the case." *Id.* at 7-9.

### I. BACKGROUND

Southland filed a complaint on December 18, 2018, claiming that the Government of the Virgin Islands and Governor Kenneth E. Mapp, in his official capacity (collectively "GVI"),

violated the terms of its contract (the "Video Lottery Agreement") with Southland. Comp. [ECF 1] ¶ 4. According to Southland, by later authorizing VIGL to operate slot machines on St. Thomas, U.S. Virgin Islands under a separate contract (the "VIGL Franchise Agreement"),[1] the GVI breached the Video Lottery Agreement's exclusivity provision, which designated Southland the sole provider of video lottery terminals. *Id.* ¶¶ 1, 4.

On February 1, 2019, VIGL moved to intervene [ECF 18], and the undersigned granted the motion [ECF 31]. In its May 14, 2019 Order, the District Court questioned "whether VIGL's presence is necessary at this stage of the case where the primary issue to be determined, at its core, is a dispute, the resolution of which, calls into question the intent of the GVI and Southland Gaming." [ECF 57] at 8. Thereafter, the parties submitted additional arguments and authority addressing this issue. [ECFs 68-1, 69, 70].

## II. LEGAL STANDARDS

Under Rule 24 of the Federal Rules of Civil Procedure, a party may move for intervention as of right or permissive intervention. Fed. R. Civ. P. 24(a)-(b). Intervention as of right is appropriate where the movant "is given an unconditional right to intervene by a federal statute" or "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a). The court must grant a motion for intervention as of right where "(1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest

---

[1] The VIGL Franchise Agreement grew out of the GVI's enactment of the Virgin Islands Horse Racing Industry Assistance Act of 2016, and Virgin Islands Act 7953. Comp. [ECF 1] at Exs. C, D, E.

may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation." *Harris v. Pernsley*, 820 F.2d 592, 596 (3d Cir. 1987). In the Third Circuit, whether the movant has a "cognizable legal interest" in the litigation may require additional analysis: "[I]t is appropriate in certain cases to conduct a two-step examination, separately evaluating whether the applicant has a right to intervene at the merits stage and whether he or she may intervene to participate in devising the remedy." *Brody v. Spang*, 957 F. 2d 1108, 1116 (3d Cir. 1992) (citing *Harris*, 820 F.2d at 599)).

Alternatively, permissive intervention is appropriate where the movant "is given a conditional right to intervene by a federal statute" or "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). Thus, a court may grant a motion for permissive intervention where it finds that (1) the movant will contribute to the litigation,[2] (2) the movant's interest is not already adequately represented,[3] and (3) the movant's involvement will not unduly delay or prejudice the original parties.[4]

### III. DISCUSSION

A. <u>The Parties' Positions</u>

The GVI does not oppose VIGL's immediate intervention, arguing that VIGL's "participation in the merits stage will contribute to a greater understanding of the issues involved in the merits phase." [ECF 68-1] at 6. Further, the GVI argues that while VIGL is not a party to the contract between Southland and the GVI, because Southland seeks equitable relief that

---

[2] *Kitzmiller v. Dover Area Sch. Dist.*, 388 F. Supp. 2d 484, 486 (M.D. Pa. 2005).

[3] *Hoots v. Pennsylvania*, 672 F.2d 1133, 1136 (3d Cir. 1982).

[4] Fed. R. Civ. P. 24(b)(3).

threatens VIGL's franchise agreement, *id.* at 6, VIGL is a "necessary party at this merits stage of the litigation," *id.* at 7.

VIGL contends that it needs immediate and continued intervention in the litigation. [ECF 69] at 1. According to VIGL, it must be permitted to intervene at the merits stage because resolution of the "merits issues" affects VIGL's rights. *Id.* In addition, VIGL contends that the Third Circuit disfavors bifurcation, and that Third Circuit precedent establishes VIGL's right to intervene at both the merits and remedy stages. *Id.* at 4-6.

First, VIGL suggests that one of the key issues in this case is "the ability of the Virgin Islands Lottery to preclude the Virgin Islands Legislature and the Casino Control Commission from passing duly enacted legislation and issuing gaming licenses to qualified entities." *Id.* at 6. According to VIGL, the instant lawsuit threatens its "legislatively created contract rights." *Id.* In addition, VIGL avers that because its interests are strictly business-related, they necessarily differ from those of the GVI. *Id.*

Next, VIGL asserts that, because the lawsuit threatens its ability to conduct business on St. Thomas, its interests are not limited to the remedy stage. *Id.* at 6-8. VIGL likens its connection to the merits issues here to that of the intervenors in *Kleissler v. U.S. Forest Service*, 157 F. 3d 964 (3d Cir. 1994). [ECF 69] at 7. According to VIGL, because the *Kleissler* plaintiffs claimed that the Forest Service violated statutory requirements related to the approval of timber harvesting, "the contract intervenors' interests in harvesting timber pursuant to government contracts, an accepted bid, or reasonable expectations of future accepted bids" were directly implicated. *Id.* VIGL contends: "As in *Kleissler*, resolving the merits question in this case will necessarily affect VIGL's interests in operating the St. Thomas racetrack, including the racino, as secured in its government contract, *i.e.*, the Franchise Agreement." *Id.*

VIGL also argues that the factors supporting bifurcation are absent in this case. *Id.* at 8. According to VIGL, traditionally the Third Circuit reserves bifurcation for cases involving institutional reform, *id.* (citing *Harris*, 820 F.2d at 599), or where the injunctive relief sought would affect a large group of people, *id.* at 8-9 (citing *Brody*, 957 F.2d at 1116 and *Benjamin v. Dep't of Public Welfare of Pa.*, 701 F.3d 938, 942-43 (3d Cir. 2012)).

VIGL further contends that bifurcation is inappropriate because, unlike the purported intervenors in *Harris*, *Brody*, and *Benjamin*, VIGL (1) "developed its own issues" by asserting that the GVI acted *ultra vires* and clarifying "the standard for constitutional impairment of contracts as opposed to mere breach of contract," (2) asserted a counterclaim against Southland for tortious interference, (3) entered into a contract—a legally protectable interest—that is "personal" and would be affected by resolution of the merits issues, and (4) did not rely extensively on the GVI's pleadings. [ECF 69] at 9-10. In addition, VIGL distinguishes the instant matter from *Harris*, *Brody*, and *Benjamin* because it is not an institutional reform case such that VIGL's interests would only be affected if the Court implemented "potentially overbroad injunctive relief." *Id.* at 10. Rather, VIGL claims that the Court's resolution of "the breadth of the exclusivity provision and the *ultra vires* issue" will "decide the fate of GVI's performance of its contract with VIGL." *Id.*

Finally, VIGL maintains that in the absence of intervention in the merits phase, collateral litigation will arise because of the issues raised in its counterclaim, and because of the possibility that Southland and the GVI will resolve certain aspects of the case without consideration of VIGL's interests. *Id.* at 11. As a result, VIGL argues that allowing its participation at the merits stage furthers Third Circuit policies that favor "intervention over subsequent collateral attacks" as a means of conserving judicial resources, *id.* at 10 (quotation marks omitted), and that encourage permissive intervention at the merits stage, *id.* at 11-12.

Southland, on the other hand, favors limiting VIGL's participation in this case to the remedy stage. [ECF 70] at 2. First, Southland argues that VIGL's interests derive solely from the equitable relief requested. *Id.* at 4-6. According to Southland, VIGL "would not be subject to liability if Southland prevails on its impairment of contract or breach of contract claim," and "can contribute nothing to any analysis of the negotiation or execution of the Video Lottery Agreement." *Id.* at 5. Instead, Southland contends, VIGL's participation at the merits stage would only delay resolution of the threshold issue of contract interpretation. *Id.* Lastly, Southland argues that limiting VIGL's participation in the litigation to the remedial phase best serves the interests of judicial efficiency. *Id.* at 6-7.

B.  Analysis

In the memorandum opinion and order granting VIGL's motion to intervene, the undersigned held that VIGL satisfied the elements both for intervention as of right and for permissive intervention. [ECF 31] at 4-11. Now, the discrete issue is whether, under *Harris* and later cases, VIGL's interests in the litigation warrant intervention as of right under Rule 24(a) at both the merits and remedy stages, or just the remedy stage.

In *Harris*, the issue was whether the District Attorney of Philadelphia County had a right to intervene in a class action lawsuit challenging the constitutionality of the conditions in Philadelphia prisons. 820 F.2d at 593. The District Attorney sought to intervene to both litigate the prisoners' claims and to object to the terms of a proposed settlement. *Id.* at 599. He claimed that one of the settlement agreement's provisions—a cap on the prison population—would impermissibly interfere with his prosecutorial powers. *Id.*

The Third Circuit found that intervention was inappropriate at either stage of the case. *Id.* at 599-600. First, the court held that because the District Attorney did not play a role in the

"administration of the prisons," he did not have a sufficient interest in the litigation to intervene as of right at the merits stage. *Id.* The court further noted that the City of Philadelphia, not the District Attorney, would be liable if prison conditions were deemed unconstitutional. *Id.* at 600. Next, the Third Circuit found that the District Attorney had no right to intervene at the remedy phase either, because the terms of the consent decree did not prevent him "from performing his statutory duties."[5] *Id.*

Five years later, in *Brody*, the Third Circuit addressed the bifurcated approach established in *Harris*. 957 F.2d at 1116. In *Brody*, graduating public high school students challenged school officials' "sponsorship of an official baccalaureate service, inclusion of religious benedictions and invocations at graduation ceremonies, and requirements that students write essays on religious subjects in English class" under the First Amendment. *Id.* at 1111. The trial court entered a temporary restraining order prohibiting prayer at the upcoming commencement proceedings. *Id.* at 1112. Thereafter, other students and parents sought to intervene, contending that the relief sought violated their First Amendment free speech and association rights. *Id.* Following graduation, the parties agreed to a consent decree, which prohibited school officials from "conducting baccalaureate services or including prayer or religious ceremonies in any graduation ceremony or other official event" at the high school. *Id.* The trial court entered the consent decree

---

[5] The District Attorney argued that he would be hindered in performing his duties as a practical matter if the proposed settlement, with its cap on prison populations, was approved because those defendants who were released pretrial might fail to appear or inmates already convicted through his efforts might not have to serve a complete sentence. 820 F.2d at 601. Although the Third Circuit found these interests too general to warrant intervention, *id.* at 602, it did note that it was "entirely appropriate" for the district court to permit the District Attorney to participate in a more limited way with respect to "contribut[ing] to the court's understanding of the consequences of the settlement proposed by the parties," *id.* at 603.

and denied the motion to intervene. *Id.* at 1112-13. The applicants for intervention appealed.[6] *Id.* at 1113.

Citing *Harris,* the Third Circuit employed a bifurcated inquiry approach, and separately evaluated appellants' motion to intervene as of right at the merits and remedy stages. *Id.* at 1116-17. As in *Harris,* the *Brody* court first observed that the underlying issue was whether certain policies were unconstitutional. *Id.* at 1116. Next, the court acknowledged that if such policies were unconstitutional, then the proposed remedy could have broad-reaching effect. *Id.* The court concluded that resolution of the underlying liability issue "would in no way have implicated the free speech rights of appellants." *Id.* Accordingly, in the court's view, the intervenors did not have the right to intervene in the merits and prevent school officials from agreeing to settle the matter. *Id.* at 1117 (quoting *Harris*, 820 F.2d at 600) (quotation marks omitted).

Next, the Third Circuit considered intervention at the remedy stage and reviewed whether the consent decree as approved "alter[ed] any of the [appellants'] legal rights and responsibilities." 957 F.2d at 1117. The court ultimately decided that whether the proposed intervenors had a sufficient interest to intervene and attack the settlement depended on other issues, and it remanded the case for further factual development. *Id.* at 1120. The court did noted, however, that the Third Circuit, "as a matter of judicial economy, favor[ed] intervention over subsequent collateral attacks." *Id*. at 1123.

In *Kleissler*, a group of environmentalists sued the U.S. Forest Service, claiming that by approving two logging projects in the Allegheny National Forest, the Forest Service violated the

---

[6] Initially, the Third Circuit denied the appeal for lack of jurisdiction because the appellants had not been granted permission to intervene. 957 F.2d at 1113. After the district court formally denied the application for intervention and a second appeal was filed, the Third Circuit held that the appeal was properly before it. *Id.*

National Environmental Policy Act ("NEPA"). 157 F.3d at 967-68. The purported intervenors in that case were of essentially three types: school districts and municipalities, logging companies with contracts, and other entities hoping to bid on future contracts. *Id.* at 968. The district court permitted intervention by those with existing contracts; it found the other applicants had only "expectation" interests.[7] *Id.* at 968.

With respect to intervention, the Third Circuit noted that the purpose of Rule 24 is to "allow intervention by those who might be practically disadvantaged by the disposition of the action." *Id.* at 970 (citing 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 1908, at 301 (1986)). After an extensive review of its own precedent and in particular NEPA cases in other Circuits, the court observed that the standard for determining whether an interest is sufficiently protectable is "nebulous" in nature and found that an "elastic approach" to this issue was preferred.[8] *Id*. at 969-70. The *Kleissler* court emphasized the fact-specific nature of the analysis:

> . . . Rule 24 demands flexibility when dealing with the myriad situations in which claims for intervention arise. Nonetheless, the polestar for evaluating a claim for intervention is always whether the proposed intervenor's interest is direct or remote. Due regard for efficient conduct of the litigation requires that intervenors should have an interest that is specific to them, is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought. The interest may not be remote or attenuated. The facts assume overwhelming importance in each decision.

---

[7] After the district court granted summary judgment for defendants on most of the claims, plaintiffs took an appeal under Federal Rule of Civil Procedure 54(b), and the appeals court also addressed the intervention issue. 157 F.3d at 969.

[8] Third Circuit Chief Judge Becker concurred in the judgment, but wrote separately to question the majority's "amorphous" approach to the Rule 24(a)(2) analysis. 157 F.3d at 974. Notably, the Third Circuit recently affirmed the continued use of the flexible and elastic approach, citing *Kleissler*. *See Pennsylvania v. President of the United States*, 888 F.3d 52, 62 (3d Cir. 2018).

*Id.* at 972.

Ultimately, the *Kleissler* court rejected the bifurcated approach as "unduly attenuating" the applicants' interests and concluded that all of the purported intervenors' interests were sufficiently direct to warrant intervention at the merits phase. *Id.* at 972-73. With respect to the school districts and municipalities, the court found that because they risked losing monies earmarked for them from timber harvesting if plaintiffs were successful, their interest was substantial and "directly related to and threatened by" the litigation. *Id.* at 973. With respect to the logging companies and related entities, the court noted that even those that had not received contracts under the challenged projects had such "longstanding dependence" on contracts with the Forest Service that intervention was warranted. *Id.*

Finally, in *Benjamin*, a group of mentally disabled individuals living in intermediate care facilities operated by the state of Pennsylvania alleged, in a class action, that the state violated federal law by failing to offer them placements in the community. 701 F.3d at 941. Several residents of the facilities opposed community placement and sought to intervene. *Id.* Following the first appeal, the Third Circuit affirmed the district court's denial of the motion to intervene at the merits phase, *id*. at 943, and following the second appeal, it remanded the case to permit intervention at the remedy stage, *id*. at 959.

Prior to the second appeal, the district court approved a proposed settlement agreement and certified a class that specifically excluded those who opposed community placement. *Id.* at 942. It also denied the proposed intervenors motion for intervention although it allowed them to participate in the fairness hearing. *Id.* at 946. On review,[9] the Third Circuit found that several

---

[9] The Third Circuit stated that while it reviews a lower court's denial of intervention for abuse of discretion, it "applies a more stringent standard to denials of intervention of right." *Id.* at 947.

provisions within the settlement agreement could potentially affect appellants' interests. *Id.* at 952. The following provisions were of particular concern to the court: (1) the settlement agreement provided that all residents were subject to a mandatory annual assessment of their preference, which they could not opt out of and (2) the settlement agreement treated residents who were unable to express a preference and had nobody to advocate for them in a default manner by classifying them as being unopposed to community placement. *Id.* at 952-53. The court concluded that under these circumstances, the appellants had "a sufficient interest in the remedy stage of the litigation and that their interest may be affected or impaired as a practical matter by the disposition of this distinct stage of the litigation." *Id.* at 952 (quotation marks omitted). The *Benjamin* court cited with approval the three-factor analysis of a proposed intervenors' interest from *Kleissler*, and observed that a bifurcated approach may be appropriate where the proposed intervenors may "not possess an interest in each and every aspect of the litigation." 701 F.3d at 951.

Upon reviewing the relevant authorities and considering the Third Circuit's pronouncements regarding its favored policies, the undersigned concludes that VIGL should be permitted to intervene as of right in all aspects of this litigation. Applying the factors and analysis articulated in *Kleissler* and *Benjamin*, it is apparent that VIGL's asserted interests are direct and not attenuated, and that VIGL's "interest [] is specific to [it], is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought." *Kleissler*, 157 F.3d 964, 972. In so concluding, the Court is not focusing merely on the "RELIEF REQUESTED" section on the penultimate page of Southland's complaint, but rather is also considering the ways VIGL's interests could be affected by proceedings at the merits stage.

Although the District Court noted that "a seminal issue" issue in the case is how Southland and the GVI defined the term "video lottery terminal" at the time they entered into the Video

Lottery Agreement, that is not the only potentially significant issue at the merits stage. Exclusivity is also an issue. VIGL's argument that when the GVI agreed to give Southland exclusive rights to provide VLTs, it acted "*ultra vires,*" goes to contract formation, is inextricably bound up with the merits of the underlying dispute, and the original parties are unlikely to address it on their own. Put another way, if the District Court finds that Southland and the GVI intended to include slot machines in their definition of VLTs, then the exclusivity provision in the Video Lottery Agreement will most likely be subject to attack by VIGL, either at the merits phase of this case or in a later proceeding. Given the Third Circuit's articulated preference for judicial efficiency and its aversion to piecemeal litigation, the interpretation of all aspects of the Video Lottery Agreement should occur in one proceeding, if possible. Thus, that VIGL was not a party to the Video Lottery Agreement does not mean that it lacks a direct and substantial interest at the merits stage of this matter. Accordingly, this issue, as well as the allegations in VIGL's counterclaim should, in the interests of judicial efficiency and economy, be determined at one time. Further, given the limited number of interested parties in this case, it is difficult to imagine how the suit could become so unwieldy that bifurcation would be preferable.

## IV. CONCLUSION

For the foregoing reasons, the undersigned concludes that, VIGL should be permitted to intervene at all stages of the case.

**Dated**: July 12, 2019    S\_____
                                                     **RUTH MILLER**
                                                     United States Magistrate Judge